Richard MAPES Plaintiff,

v.

CHEVRON USA PRODUCTS COMPA-
NY A DIVISION OF CHEVRON
U.S.A., INC., Chiles Drilling Company,
Chiles Offshore, Inc. the Owner/Oper-
ator of Chiles Tonola said companies,
their assets and liabilities merged into
Noble Drilling Corporation, its succes-
sor in interest, Defendants.

No. CIV.A. G–01–698.

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 31, 2002.

Kenneth Ross Citti, Citti & Associates, Houston, TX, for Plaintiff.

Charles Douglas Wheat, Killeen & Wheat, HOuston, TX, Edward Wesley Johnson, Johnson Ferguson, Houston, TX, for Defendant.

***ORDER DENYING CROSS–PLAINTIFF CHILES OFFSHORE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT AND CROSS– DEFENDANT CHEVRON U.S.A. PRODUCTS COMPANY, INC.'S MOTION FOR STAY OF JUDICIAL PROCEEDINGS***

KENT, District Judge.

Cross–Plaintiff Chiles Offshore, Inc. N/K/A Ensco Offshore Drilling, Inc. ("Chiles") brings this cross-claim seeking a Partial Summary Judgment against Cross– Defendant and Defendant Chevron U.S.A.

Products Company, Inc. ("Chevron"). Specifically, Chiles submits its Motion on the grounds that Chevron is contractually obligated to defend and indemnify Chiles for the underlying personal injury action. Chevron responds by requesting this Court to stay judicial proceedings and compel arbitration as Chiles and Chevron's contract allegedly requires. After receiving Chevron's Motion, this Court respectfully requested that Chiles respond to the merits of whether this case should appropriately be stayed and compelled to arbitration. Chiles promptly filed a reply asserting that Chevron had waived its rights to compel arbitration. For the reasons articulated below, the Court **GRANTS** Chevron's Motion for Stay of Judicial Proceedings and **DENIES AS MOOT** Chiles Motion for Partial Summary Judgment.

## I. FACTUAL SUMMARY

Richard Mapes was injured while working for Superior Energy Services, L.L.C. ("Superior") on the jack-up drilling vessel TONOLA. Mapes brought suit against Chevron and Chiles on May 3, 2001, alleging that Chiles and others were negligent and that the TONOLA, which is owned by Chiles, was unseaworthy. Chiles filed this cross-claim seeking contractual defense and indemnity from Chevron for all amounts that Mapes may obtain from Chiles, including interest, court costs, and attorneys' fees. Chiles contends that it is entitled to indemnification because of the Chiles–Chevron Master Drilling Contract ("MDC"), the contract that the Parties entered into before commencing their joint drilling operation on the TONOLA. In the MDC, there is a general indemnity agreement between Chiles and Chevron under sections 807.1 and 807.2. In these sections, Chiles and Chevron created a reciprocal indemnity agreement where each agreed to indemnify the other for injuries to its own employees and property, regardless of fault.[1]

Additionally and more important to the present issue, the MDC also contained Schedule G, titled Agreement for Mutual Indemnity and Waiver of Recourse ("Schedule G"), which both Parties signed. Schedule G required that all contractors and subcontractors involved in this drilling project with Chevron agree[2] to indemnify not only Chevron for injuries to each contractor's personnel or property, but also to indemnify every other contractor associated with that project. Thus, Chevron created a system of reciprocal mutual indemnity between all the contractors, subcontractors, and Chevron, where essentially if an entity's employee or property were injured, that entity would contractually defend any resulting action and indemnify every other entity involved on that project, regardless of fault. Furthermore, in MDC section 807.3, as an extension of Schedule G, Chevron committed that:

> In the event [Chevron] chooses to use the services and/or materials of a Non–Signatory or if any Signatory successfully challenges the enforceability of said Agreement or for whatever reason fails to indemnify Contractor in accordance with said Agreement for Mutual Indemnity and Waiver of Recourse, then [Chevron] shall so indemnify Contractor in accordance with the terms and conditions set forth therein.

Although the different sections may appear confusing at first, explaining how

---

1. For example, if Chiles's employee were injured while working on behalf of the drilling operation, and the employee sued Chevron and Chiles, Chiles would indemnify Chevron regardless of fault. The opposite would be true if Chevron's employee were injured.

2. Contractors agreed by signing and becoming a signatory to Schedule G.

each Party fits into this indemnification landscape will illuminate how the language of the MDC operates and the crux of Chiles's present Motion. Mapes was an employee of Superior. Mapes was allegedly injured while working on the TONOLA and brought this action against Chevron and Chiles, two parties that were part of the drilling operation on the TONOLA. Superior, Chiles, and Chevron were all signatories to Schedule G. Therefore, since Superior's employee was injured, Schedule G apparently requires that Superior indemnify every other entity (Chiles and Chevron in this case) that Mapes brought an action against for its involvement in the drilling operation. At that point, if Superior refuses to indemnify, MDC section 807.3 intercedes and requires Chevron to indemnify any contractor that is sued by Mapes (Chiles). In fact, Chiles' counsel, Ronald White, attached an affidavit stating that he had contacted Superior and that Superior declined to indemnify and defend Chiles. Hence, for these legitimate reasons, Chiles has brought this Motion for Partial Summary Judgment seeking Chevron's indemnification pursuant to MDC section 807.3

Chevron asserts that Mr. White's affidavit is legally insufficient to prove that Superior did indeed decline to indemnify Chiles. Much more importantly to this Court's instant analysis, Chevron then asserts that the MDC requires binding arbitration between the Parties. MDC section 1108, titled "Dispute Resolution," states:

> The Parties shall resolve any controversy, or claim, whether based in contract, tort or otherwise, arising out of, relating to, or in connection with this Contract, the breach or validity of this Contract; or the commercial or economic relationship of the parties hereto ("Dispute") in accordance with the procedures set forth in Schedule C.

Schedule C, titled "Dispute Resolution," is a six page comprehensive agreement on how to handle disputes arising out of the MDC. First, it requires senior executives from each Party to negotiate for a limited period of time. If they are unsuccessful, the dispute must be submitted to mediation. If the mediation fails, Schedule C requires that the issue be resolved by arbitration. Specifically, Section 4.5 of Schedule C requires that the arbitration be governed by the United States Arbitration Act, 9 U.S.C. §§ 1–16, and that the arbitrator render a final award in accordance with the General Maritime Law of the United States.

## II. ANALYSIS

At the outset, the Court notes that it is imperative to address the Motions out of turn in an effort to avoid stepping beyond this Court's Article III jurisdiction by issuing an advisory opinion. Accordingly, the Court first addresses whether or not this action should be stayed and compelled to arbitration. After thoughtfully and carefully reviewing the Parties' Motions, the Court concludes that the indemnity dispute is squarely within the scope of the MDC dispute resolution clause. Additionally, although the Court frankly regrets that this cross-action has proceeded this far without Chevron disclosing to the Court its intention to arbitrate, the Court finds that Chevron did not waive its contractual right to compel arbitration. Therefore, the Court need not, and does not herein, reach whether or not Chevron owed Chiles an indemnity obligation.

*A. The MDC mandates that this action be stayed and compelled to arbitration.*

 Generally, there is a strong federal policy favoring the arbitration process. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (noting that the Federal Arbitration Act manifests

a liberal federal policy favoring arbitration agreements); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *Life of Am. Ins. Co. v. Aetna Life Ins. Co.,* 744 F.2d 409, 412–13 (5th Cir.1984). Moreover, this Court follows the four guiding principles that the United States Supreme Court established regarding arbitrability. First, and of particular relevance to the matter now before the Court, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Second, unless the parties "clearly and unmistakably provide otherwise, the question of [arbitrability] ... is to be decided by the court...." *Id.* at 649, 106 S.Ct. at 1418. Third, in deciding arbitrability, "a court is not to rule on the potential merits of the underlying claims." *Id.* at 649, 106 S.Ct. at 1419. Fourth, "where the contract contains an arbitration clause, there is a presumption of arbitrability... 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)). Nevertheless, an express provision excluding a particular grievance from arbitration may overcome this presumption. *See AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. at 1419.

The preliminary question now before the Court is that of arbitrability. When confronted with the question of arbitrability, a District Court must determine, as a threshold matter, whether the issue before it is subject to arbitration in this case, whether the indemnification dispute within the scope of the MDC's Schedule C. *See Folse v. Richard Wolf Med. Instruments Corp.,* 56 F.3d 603, 605 (5th Cir. 1995); *Oil, Chem. & Atomic Workers Int'l Union Local 4–227 v. Phillips 66 Co.,* 976 F.2d 277, 278 (5th Cir.1992). This determination mandates two specific inquiries. First, the Court asks whether there is a valid agreement to arbitrate; if so, the Court then asks whether the dispute in question falls within the scope of the agreement. *See Webb v. Investacorp, Inc.,* 89 F.3d 252, 257–58 (5th Cir.1996). Ordinary state contract law will generally guide the Court in ruling on arbitrability. *See id.* at 258. However, the Parties and the Court agree that the MDC is governed by the General Maritime Law of the United States.[3]

In this case, neither Party contests that the MDC is a valid contract that was duly executed. Second, it is clear that this indemnification dispute is within the scope of MDC Schedule C. As pointed out previously, section 1108 of the MDC, titled "Dispute Resolution," specifically stated that all potential disputes arising out of the MDC would be governed by Schedule C. Section 1 of Schedule C, titled "Resolution of Disputes," states:

> The Parties shall resolve any controversy or claim, whether based in contract, tort or otherwise, arising out of, relating to or in connection with the Agreement,

---

**3.** Schedule C, section 4.5 and MDC, section 1107, titled "Governing Law," harmoniously agree that any disputes shall be determined in accordance with the General Maritime Law of the United States. Additionally, the Fifth Circuit has held that contracts are maritime in nature when they are contracts for the supply and use of a vessel (including a jack-up rig) for drilling and completing wells, and for any general services connected to such. *See Dupre v. Penrod Drilling Corp.,* 993 F.2d 474, 475 (5th Cir.1993).

the breach or validity of the Agreement; or the commercial or economic relationship of the Parties hereto ("Dispute") in accordance with this Schedule. The Parties' agreement to resolve Disputes pursuant to this Schedule survives the expiration or termination of the Agreement.

Schedule C does not contain any exceptions to this broad language that literally encompasses *any* dispute that could arise out of this contract. Furthermore, Chiles has sufficient bargaining power and sophistication that it cannot be seriously argued that constraints external to the Parties' agreement foreclose the arbitration of these claims.

▬ Having determined that the Parties' dispute should be arbitrated under the MDC, the Court reviews United States Arbitration Act, 9 U.S.C. § 3, to determine if this action must be stayed. The aforementioned Act states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Thus, this Court is mandated by the MDC to stay this action since the indemnification dispute is within the reach of the agreement. *See Gutierrez v. Academy Corp.,* 967 F.Supp. 945, 947 (S.D.Tex.1997). Having determined that the instant dispute should be arbitrated by the terms of the MDC, the Court now determines whether or not Chevron waived its contractual right to arbitration, and therefore, is in "default of proceeding with such arbitration." United States Arbitration Act, 9 U.S.C. § 3.

*B. Chevron did not waive its contractual right to arbitrate this indemnification dispute.*

Chiles contends that Chevron has waived its right to compel arbitration for two reasons. First, Chiles urges that Chevron did not answer Chiles's cross-claim as required by Federal Rule of Civil Procedure 7(a). Since Chevron did not answer the cross-claim, Chiles claims that Chevron waived its right to compel arbitration because it did not assert the affirmative defense of "arbitration and award," which is required by Federal Rule of Civil Procedure 8(c). Second, looking past the technical defects of Chevron's pleadings, Chiles argues that Chevron's participation in this Court's procedural machinery is inconsistent with its contractual right to arbitrate, and therefore, Chevron waived its right to arbitrate, and any finding otherwise will unduly prejudice Chiles, since trial is set for December 9, 2002. Specifically, Chiles contends that Chevron has acted inconsistently with its arbitration rights by having engaged in "extensive written discovery, attended the Court's Rule 16 Conference, participated in the preparation of the Joint Discovery/Case Management Plan under Rule 26(f), participated in at least two depositions, and mediation."

In order to fully appreciate Chiles's concerns, the Court feels it necessary to review and summarize the history of this cross-claim before the Court. Chevron first appeared and answered the underlying personal injury lawsuit on December 6, 2001. As early as February 25, 2002, Chiles's counsel contacted Chevron's counsel to inform Chevron that Superior was declining to defend and indemnify Chiles.

On March 14, 2002, the Court entered a Docket Control Order that cut off discovery on November 8, 2002, and set trial for the entire case on December 9, 2002. On June 26, 2002, Chiles filed a Motion for Leave to file its Original Cross–Claim against Chevron and simultaneously filed its Original Cross–Claim against Chevron. This Motion was granted on July 19, 2002. Subsequently, Chiles filed its present Motion for Summary Judgment against Chevron on September 25, 2002–the starting point of the instant Order.

 Like any contractual right, the right to arbitrate can be waived. *Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 497 (5th Cir.1986). However, there is a strong presumption against finding waiver, and any doubts are resolved in favor of arbitration. *See Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.,* 304 F.3d 476, 484 (5th Cir.2002) (quoting *Texaco Exploration & Prod. Co. v. AmClyde Engineered Prods. Co.,* 243 F.3d 906, 911 (5th Cir.2001)) (citing *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 326 (5th Cir.1999)). Chiles bears a heavy burden to establish that Chevron waived its right to arbitrate this indemnification dispute arising out of the MDC. *See Gulf Guar.,* 304 F.3d at 484; *Walker v. J.C. Bradford & Co.,* 938 F.2d 575, 577 (5th Cir.1991). To carry its burden, Chiles must show that Chevron "has 'substantially invoked the judicial process,' and has done so to the detriment or prejudice of the other party." *Cline v. H.E. Butt Grocery Co.,* 79 F.Supp.2d 730, 734 (S.D.Tex.1999) (Kent, J.) (quoting *Subway Equip. Leasing Corp.,* 169 F.3d at 326; *Miller Brewing Co.,* 781 F.2d at 497).

 The Court first addresses Chiles's argument that Chevron's failure to file an answer pleading its affirmative defense of "arbitration and award," alone, is sufficient to constitute waiver of Chevron's arbitration rights. There is little doubt that Chiles is indeed correct that generally the defense of "arbitration and award" must be plead in response to a preceding pleading. *See* Fed.R.Civ.P. 8(c). However, that affirmative defense applies only when disputes have already been arbitrated and the award has been obtained, which is not the situation now before the Court. 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1270 n. 13 (2d ed.2002). Although the Court commends Chiles's counsel for an excellent job in his attention to the Parties' pleadings, this Court feels constrained not to dwell on a pleading technicality, inasmuch as to do so would inappropriately ameliorate the strong burden that Chiles must carry for this Court to find that Chevron waived its arbitration rights. Rather, the Court turns to Chiles's substantive concerns of whether Chevron waived its rights by substantially invoking the judicial process at Chiles's expense.

 At the outset, the Court notes that it is difficult to determine the extent that Chevron participated in this lawsuit in relation to Chiles's cross-claim. For example, Chiles contends that Chevron participated in written discovery, attended two depositions, and attended a mediation. The Court does not dispute Chevron's active participation in the overall lawsuit; in fact, the Court has observed it. However, the discovery period in this lawsuit arose well before Chiles filed its Original Cross–Claim against Chevron in June. Chevron's cited participation could have been entirely in relation to the underlying suit the personal injury action by Mapes without having invoked the judicial process to defend against Chiles's cross-claim. Despite this difficulty, the Court does know that Chiles's cross-claim was on file for approximately three months before Chevron acted on its contractual rights to arbitrate this dispute. Furthermore, trial is set only a

little over one month away and the discovery period ends in less than two weeks.

This Court does not look with favor upon Parties who press their cases in this Court only to subsequently seek arbitration hence, wasting this Court's precious judicial resources and the resources of the other parties. Echoing this Court's sentiment, the Court in *Walker* explained:

> In general, we do not look kindly upon parties who use federal courts to advance their causes and then seek to finish their suits in the alternate fora that they could have proceeded to immediately. Such actions waste the time of both the courts and the opposing parties. The decision whether to arbitrate is one best made at the onset of the case, and not part of the way through as Bradford seeks today. The attempt of Bradford's attorneys to switch judicial horses in midstream either shows poor judgment, if planned, or poor foresight, if not.

938 F.2d at 577. But despite that seeming frustrating, even this close to trial, the Court concludes that Chevron has not sufficiently invoked the judicial process at Chiles's detriment to warrant waiver of Chevron's arbitration rights.

Essentially, Chevron conducted a small amount of discovery and delayed asserting its arbitration rights for three months after Chiles's Original Cross–Claim was filed. Simply put, Chevron's actions, although seemingly inefficient and/or inconvenient, are insufficient to constitute waiver of its contractual arbitration rights. *See Gulf Guar.*, 304 F.3d at 484 (explaining that taking "substantial steps" toward litigating an arbitral dispute or participating in litigation procedures will not likely waive a party's right to arbitrate); *Texaco Exploration*, 243 F.3d at 911 (stating that a party's delay in asserting its arbitration rights, alone, is an insufficient reason to find waiver); *Walker*, 938 F.2d at 577 (reversing the trial court's finding of waiver

despite that the defendant had removed the action to federal court, answered, and actively participated in discovery only to seek arbitration thirteen months later); *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420–21 (5th Cir.1985) (finding no waiver despite that defendants filed an answer, interrogatories, request for a document production, moved for a protective order, agreed to an extension of a discovery period, and then requested arbitration seven months later); *Cline*, 79 F.Supp.2d at 734 (finding no waiver despite that the defendant began discovery and later sought to compel arbitration five months after the lawsuit was filed).

The Court regretfully recognizes that its present ruling will likely result in piecemeal litigation in this case. However, Congress has concluded that arbitration has a higher purpose and role that supercedes this Court's concern for piecemeal resolution. Additionally, questions of arbitrability are addressed against the backdrop of a clear and well-established federal policy favoring arbitration, and as a result, waivers of arbitration are rarely found. Therefore, the Court must, given the clear and unambiguous language in the MDC, stay the cross-claim only, and compel the Parties to act in accordance with Schedule C in the MDC. Despite that this conclusion is essentially mandated by the current law, the Court implores the parties to consider that condemning them to their contract (arbitration) will defeat the very goal of arbitration less expensive and expedited alternative to litigation. In fact, the Court anticipates that dispute resolution in this case will result in more expenditures by all Parties involved, and therefore encourages the Parties and their counsel to consider resolution of the entire dispute amicably, especially in light of the upcoming trial on the underlying personal injury suit. The Court finds it difficult to believe that lawyers of the genuinely excellent caliber of

those involved herein cannot come to a complete meeting of the minds.

For the reasons set forth above, Chiles's Motion for Partial Summary Judgment is **DENIED AS MOOT**, and Chevron's Motion for Stay of Judicial Proceedings is hereby **GRANTED**. The Parties are **ORDERED** to initiate proceedings consistent with the terms of MDC Schedule C. Accordingly, Chiles's cross-claim against Chevron *only* is **SEVERED** and **STAYED** until the Parties initiate and complete the dispute resolution proceedings that they agreed upon in MDC Schedule C. The residue of this case remains set for trial on December 9, 2002, and will be tried when reached.

**IT IS SO ORDERED.**